HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GORLICK DISTRIBUTION CENTERS,
LLC,

               Plaintiff,

     v.

CAR SOUND EXHAUST SYSTEM, INC.,
et al.,

               Defendants.

CASE NO. C07-1076RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendant Allied Exhaust System, Inc.'s motion for partial summary judgment (Dkt. # 83).  The court has considered the parties' briefing and supporting evidence, and also heard oral argument.  For the reasons explained below, the court GRANTS IN PART and DENIES IN PART the motion (Dkt. # 83).

## II.  BACKGROUND

Plaintiff Gorlick Distribution Centers, LLC ("Gorlick") distributes "aftermarket" automotive parts, which are new or reconditioned parts used during the repair or servicing of automobiles.  Gorlick purchases the parts from manufacturers and resells them to automotive repair stations, muffler shops, and retail automotive parts stores.

ORDER – 1

Gorlick distributes aftermarket exhaust systems and catalytic converters, among other types of parts.

Car Sound Exhaust System, Inc. ("Car Sound"), a former defendant in this action (*see* Notice of Voluntary Dismissal (Dkt. #35)), manufactures the "Magnaflow" brand of exhaust systems and catalytic converters. Car Sound sells Magnaflow products to distributors in Washington, Oregon, and California.

Gorlick and Defendant Allied Exhaust Systems, Inc. ("Allied") both purchased Magnaflow products from Car Sound. Gorlick and Allied are competitors in West Coast markets. Gorlick claims that Car Sound has economically favored Allied over Gorlick in two ways: (1) Per an agreement with Allied, Car Sound refused to ship Magnaflow products to Gorlick in Washington or Oregon (hereinafter "the Northwest"), and (2) Car Sound provided Allied with illegal discounts and rebates.

Gorlick's complaint against Allied asserts claims for, *inter alia*, price discrimination under the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13(f), and a claim for restraint of trade under the Sherman Act, 15 U.S.C. § 1. Allied now moves for summary judgment against those two claims.

### III.   ANALYSIS

**A.   Legal Standards on a Summary Judgment Motion.**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets that initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the non-moving party. *See Eastman Kodak Co. v.*

ORDER – 2

*Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**B.  Plaintiff's RPA Claim Survives Summary Judgment as to Car Sound's Shipping Policy.**

Gorlick claims that Allied is liable under Section 2(f) of the RPA because it knowingly received or induced illegal price discrimination from Car Sound.  The court will first address the elements of an RPA claim, and then turn to examine the evidence.

**1.  Legal Elements of an RPA Claim.**

One section of the RPA addresses buyer liability:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

15 U.S.C. § 13(f).  Because Section 13(f) liability depends on the buyer's knowledge that the price discrimination received or induced is unlawful, a buyer cannot be liable under Section 13(f) "if the lower prices he induces are either within one of the seller's defenses such as the cost justification or not known by him not to be within one of those defenses." *Automatic Canteen Co. of Am. v. F.T.C.*, 346 U.S. 61, 74 (1953).  The court qualified that statement with the following:

> If the requirement of knowledge in §2(f) has any significant function, it is to indicate that the buyer whom Congress in the main sought to reach was the one who, knowing full well that there was little likelihood of a defense for the seller, nevertheless proceeded to exert pressure for lower prices. Enforcement of the provisions of §2(f) against such a buyer should not be difficult.  Proof of a cost justification being what it is, too often no one can ascertain whether a price is cost-justified.  But trade experience in a particular situation can afford a sufficient degree of knowledge to provide a basis for prosecution.  By way of example a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner or with the same amount of exertion as the other buyer can fairly be charged with notice that a substantial price differential cannot be justified.

*Automatic Canteen*, 346 U.S. at 79-80.  In a subsequent case, the Supreme Court again clarified buyer liability under the RPA: "[A] buyer cannot be liable if a prima facie case

ORDER – 3

could not be established against the seller or if the seller has an affirmative defense." *Great Atlantic & Pacific Tea Co., Inc. v. F.T.C.*, 440 U.S. 69, 76 (1979). It is the plaintiff's burden to establish the seller's violation and the buyer's knowledge thereof. *Automatic Canteen*, 346 U.S. at 79 n.6. Knowledge may be inferred from circumstantial evidence. *See, e.g.*, *Kroger Co. v. F.T.C.*, 438 F.2d 1372, 1377-78 (6th Cir.), *cert. denied*, 404 U.S. 871 (1971).

In this motion, the elements at issue are whether the evidence shows that (1) Allied knowingly induced or received price discrimination, and if so, whether (2) Allied knew or should have known that the price discrimination was illegal and not subject to a seller defense.

### 2. Viewing the Evidence in the Light Most Favorable to Gorlick, Gorlick has Established that Allied Knew It Received Illegal Price Discrimination in the Form of Car Sound's Shipping Policy.

Allied argues that Gorlick's RPA claim must fail because Gorlick has failed to establish that Allied "knew the prices, discounts, and other terms Car Sound gave Gorlick or any other Car Sound distributor." Def.'s Mot. (Dkt. # 83) at 11. To support this argument, Allied cites the deposition testimony of Car Sound President Gennaro Paolone (stating that Car Sound never shares the price lists of one distributor with another distributor), and the deposition testimony of Car Sound Vice President Larry Norris (the same). *See* Thomsen Decl. (Dkt. # 84), Exs. 1 & 6. Four Allied employees, including the former CEO and three managers, testified that Allied did not know the prices that Car Sound gave Gorlick or other competitors. *See* Thomsen Decl. (Dkt. # 84), Exs. 2, 7-9.

Gorlick suggests that Allied's knowledge of price discrimination can be inferred from a number of pieces of evidence, specifically (1) Allied's knowledge that Car Sound was not shipping to Gorlick in the Northwest; (2) a 2003 memo from an Allied manager to Allied employees stating that though Car Sound would not share its list of customer prices, the manager would ask Car Sound for the information if an Allied employee

ORDER – 4

1  requested it; (3) a 2008 e-mail between an Allied manager and a Car Sound sales

2  representative; and (4) Allied's possession of a Car Sound confidential price sheet that

3  did not identify customers, but explained the different terms offered to categories of

4  customers.[1]

5      The court finds that most of the evidence cited by Gorlick does not show that

6  Allied knew it was receiving discriminatory prices.  The 2003 memo is simply puffery on

7  the part of the Allied manager, conveying his confidence that Car Sound would share

8  pricing information with him, but the Allied manager also testified that no such

9  information request was ever made and that he did not ask Car Sound to disclose the

10  information.  *See* Thomsen Decl. (Dkt. # 84), Ex. 11.  The 2008 e-mail exchange

11  discusses changes to Car Sound's pricing as a result of its settlement with Gorlick, but

12  does not infer anything about Allied's price knowledge pre-settlement, which is the

13  relevant time period for this lawsuit.  *See* 2d Lundsgaard Decl. (Dkt. # 98), Ex. 6.  And to

14  whatever degree Car Sound's "confidential" price sheet informed Allied about the price

15  categories Car Sound established for its customers, it does not establish that Allied would

16  have any basis to know which categories applied to which distributors or whether those

17  price categories were illegal.  *See* 2d Lundsgaard Decl., Ex. 4.[2]

18

19  ───────────────

[1] This confidential price sheet referenced various categories of pricing, including "trailer load"

20  and "pallet" pricing discounts, and Gorlick attempts to argue that sheet establishes that Allied
   knew it was receiving discounts that it did not deserve and that other competitors did not receive.

21  *See* Pltf.'s Opp'n (Dkt. # 91) at 13-14.  But just because Allied may have been aware that Car
   Sound did not strictly enforce its pricing terms with Allied (according to the sheet) does not

22  suggest anything about what Allied should have assumed about Car Sound's treatment of
   competitors as a result.  *See, e.g.*, Thomsen Decl. (Dkt. # 84), Exs. 8-9 (Allied employees'
   deposition testimony that Allied was unaware whether Gorlick obtained the same rebates or

23  discounts).

24  [2] The court also rejects Gorlick's argument regarding Allied's knowledge through trade
   experience, under *Fred Meyer, Inc. v. F.T.C.*, 359 F.2d 351 (9th Cir. 1966), *rev'd in part on*

25  *other grounds*, *F.T.C. v. Fred Meyer, Inc.*, 390 U.S. 341 (1968).  This case is factually
   distinguishable from *Fred Meyer* because, as described *supra*, there is no evidence that Allied

26  solicited the allegedly discriminatory treatment, or that Allied knew how Car Sound applied its
   multi-level discount/rebate system among its various distributors.  That Allied knew only that

27  Car Sound did not strictly enforce its pricing system with regard to Allied does not suggest that

28  ORDER – 5

1   But with regard to Car Sound's refusal to ship to Gorlick in the Northwest: it is

2   undisputed that Allied was aware of this policy.  Allied argues that the practice was legal,

3   and thus cannot support an RPA claim.  Allied cites *Continental T.V., Inc. v. GTE*

4   *Sylvania, Inc.*, 537 F.2d 980, 997 (9th Cir. 1976), as upholding a manufacturer's ability to

5   "impose restrictions and designate a particular business as its exclusive distributor in a

6   given area, even if it eliminates other distributors," absent evidence of monopolization

7   (which Gorlick does not allege).  Def.'s Reply (Dkt. # 100) at 10.  While that may be true

8   (and Gorlick argues that Allied's characterization of *Sylvania* is legally incorrect), this

9   case is not about an exclusive distributorship.  Allied and Gorlick competed directly on

10   the West Coast, and both sold Car Sound product.  The issue here is the difference in

11   shipping terms: Car Sound would ship to Allied in the Northwest, but would not ship to

12   Gorlick in the Northwest.  Gorlick nonetheless sought to sell Car Sound product in the

13   Northwest and, in order to do so in light of Car Sound's shipping policy, ordered Car

14   Sound product in California and then shipped the product to its Northwest locations.

15   Different shipping terms may constitute cognizable price discrimination under the RPA,

16   which prohibits both direct and indirect price discrimination.  *See Corn Prods. Refining*

17   *Co. v. F.T.C.*, 324 U.S. 726, 740 (1945).

18   Allied does not deny that Car Sound did not ship to Gorlick in the Northwest,[3] but

19   argues that this shipping policy was not illegal, because no injury to competition

20   occurred.  According to Allied, even though Gorlick had to absorb shipping costs in order

21   to sell Car Sound product in the Northwest, Gorlick "always matched Allied's retail

22   prices (or offered lower prices than Allied)[,]" so Car Sound's shipping policy did not

Allied knew anything about how Car Sound did or did not enforce its pricing system with regard
to Gorlick or any other distributor.  Under these circumstances, the court cannot find that Allied
should have had a reasonable suspicion that the discounts/rebates it received were probably
illegal, and thus the duty of inquiry does not apply.  *See Fred Meyer*, 359 F.2d at 365-67.

[3] Allied does not dispute that it knew that Car Sound did not ship to Gorlick in the Northwest,
but does contend that Car Sound's policy did not result from an agreement with Allied.  *See*
Def.'s Reply at 10:4-8.

ORDER – 6

restrain intrabrand competition.  Def.'s Reply (Dkt. # 100) at 10-11 (citing deposition testimony that Gorlick matched Allied's prices).  Allied also argues that there could not have been any restraint on interbrand competition, given that it "is undisputed that many of manufacturers' aftermarket exhaust products were distributed in the Northwest[.]"  Def.'s Reply (Dkt. # 100) at 11.  Thus, according to Allied, Car Sound's shipping policy did not have anticompetitive effects and thus was not illegal.

In response to those arguments, Gorlick contends that intrabrand competition was affected precisely because Gorlick matched or occasionally beat Allied's retail prices: Gorlick had to achieve that result despite its additional shipping costs.  Gorlick's expert opined that Car Sound's shipping policy affected intrabrand competition because Gorlick charged higher prices relative to Allied when it had to absorb shipping costs as compared with later, post-settlement, when it did not.  *See* Ugone Decl. (Dkt. # 122) ¶ 19. Eliminating the shipping prohibition allowed "Gorlick to compete much more effectively and offer lower prices to its customers.  Because Allied and Gorlick comprised the bulk of the [Northwest] market, lower prices from Gorlick would mean lower prices systemwide."  *See* Pltf.'s Supp. Br. (Dkt. # 120) at 5; Ugone Decl. (Dkt. # 122) ¶¶ 19-20. Thus, because Gorlick has submitted evidence of actual detrimental effects on competition flowing from Car Sound's shipping policy, Gorlick contends that it has shown that the shipping policy was illegal and thus Allied's knowledge that it received illegal price discrimination triggers liability under the RPA.  *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-61 (1986) (discussing the standard for determining whether a restraint on trade destroys competition, and the methods of proving injury to competition).

The court agrees that, viewing the evidence in the light most favorable to Gorlick, Gorlick's evidence defeats summary judgment as to Car Sound's shipping policy because it shows that over a period of time, Gorlick's net price for Car Sound product was more

ORDER – 7

than Allied's price for those same products, and after Car Sound changed its shipping policy, Gorlick "charged lower prices substantially more frequently than before." *See* Ugone Decl. (Dkt. # 122) ¶¶ 18-19.   This evidence permits an inference that Car Sound's shipping policy had a detrimental effect on competition. *See Volvo Trucks North Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 179 (2006) (permitting, in a case involving allegations of a secondary-line price discrimination RPA violation, an inference of competitive injury from "proof of a substantial price discrimination between competing purchasers over time").

Furthermore, viewing the evidence in the light most favorable to Gorlick, it can be reasonably inferred that Allied should have known that Car Sound's shipping policy was not justified by cost — and cost justification is the only potential defense mentioned by Allied with regard to Car Sound's shipping policy[4] — because shipping costs to Gorlick or Allied in the Northwest should be similar, with perhaps some minor variations based on order quantity.   To whatever degree Allied contends that other "Allied practices" (such as electronic ordering) justified Car Sound's different treatment, there is no evidence that those practices should have affected the cost of shipping to the Northwest.

Thus, because it is undisputed that Allied knew that Car Sound refused to ship to Gorlick in the Northwest, and there are factual disputes as to whether that shipping policy had anticompetitive effects and was therefore illegal, Gorlick's RPA claim based on Car Sound's shipping policy will survive summary judgment.   Gorlick's RPA claim will not go forward as to any of the other alleged discounts or rebates (such as pallet pricing or trailer-load pricing), because Gorlick has not submitted evidence that Allied knew how Car Sound applied those discounts or rebates, such that Allied would have no basis to know that it was receiving price discrimination or whether Car Sound would have an applicable defense.

---

[4] *See* Def.'s Mot. at 6:17-21.

ORDER – 8

**C.      Plaintiff's Sherman Act Claim Fails For Lack of Evidence of Concerted Action.**

Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies that unreasonably restrain competitive conditions.  *See* 15 U.S.C. § 1; *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 690 (1978) (citing *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911)).  Because Section 1 focuses on contracts and other concerted action, it "does not reach conduct that is 'wholly unilateral.'"  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quoting *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968)).  Direct evidence of concerted action is not required, however:

> The Ninth Circuit has long recognized that "it is not necessary for a plaintiff to show an explicit agreement among defendants in support of a Sherman Act conspiracy," and that concerted action may be inferred "from circumstances evidence of [a] defendant's conduct and course of dealing."

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1192 (N.D. Cal. 2009) (quoting *Movie 1 & 2 v. United Artists Commc'ns*, 90 F.2d 1245, 1251-52 (9th Cir. 1990)).

Allied argues that Gorlick's Sherman Act claim fails as a matter of law because Gorlick has failed to present any evidence that Allied and Car Sound *agreed* that Car Sound would not ship to Gorlick in the Northwest.  According to Allied, Car Sound's decision not to ship to Gorlick in the Northwest was unilateral action, and therefore not prohibited by Section 1 of the Sherman Act.

In opposition, Gorlick points to statements made by three individuals: Tom Jones, Steve Blanding, and Larry Norris.  Gorlick contends that these statements establish that Allied induced Car Sound to not ship to Gorlick in the Northwest.

**1.      Tom Jones' Testimony.**

Allied's former CEO Tom Jones was deposed as follows:

ORDER – 9

Q     When you started distributing Car Sound product out of the Tukwila warehouse, did you have any understanding as to whether or not Gorlick was going to be distributing Car Sound product in Washington and Oregon?

A     I made the statement many times that: I'm not going to build the market and – for – and then have somebody else come in on it.  And I made the statement many times: I don't want – if I build the market, leave me alone.  Many times.

Q     The statement you made to Mr. Gorlick?

A     No.  To Car Sound.

Q     Oh, okay.  So to Mr. Paolone at Car Sound?

A     And anybody who would listen.

Q     Do you recall any reaction you got from Car Sound to that?

A     I think that they always said, "No, we don't sell [sic] anybody. You're our only distributor there."  But they – they always – the caveat also was, they can't tell Mr. Gorlick what to do with the product once he – once he gets it in a different location.

Q     That he could buy it, say, in California and ship it up here?
A     Yes.  And there's nothing they could do about that.

First Lundsgaard Decl. (Dkt. # 96), Ex. L.  Though Gorlick characterizes this testimony as describing "conversations with Car Sound at the time that clearly establish the existence of an agreement" between Allied and Car Sound that Car Sound would not ship to Gorlick in the Northwest, the court disagrees with that characterization.  *See* Pltf.'s Opp'n (Dkt. # 91) at 19.  Mr. Jones's deposition testimony establishes that he told Car Sound representatives that he wanted to be the only Car Sound distributor in Washington and Oregon, and that Car Sound responded that they did not sell to any other Washington or Oregon distributor.  This does not amount to "offer; acceptance; agreement," as Gorlick contends.  *See* Pltf.'s Opp'n at 20.  At minimum, Mr. Jones's testimony

ORDER – 10

establishes a request, and a reassurance.  Mr. Jones's testimony does not suggest that Car Sound decided not to ship to Gorlick in the Northwest as a result of Mr. Jones's requests — Car Sound's responses to Mr. Jones suggest that Car Sound had already made that decision.

**2.    Steve Blanding's E-mail.**

Allied's CEO Steve Blanding sent an e-mail to Car Sound's sales manager Larry Norris in December 2004, which reads as follows:

> Larry, its [sic] time to face the music.  Harold continues to sell Magnaflow and Carsound [sic] product in the Northwest and to undercut the market significantly. You assure us that he is not supposed to have the product line outside California and yet you close your eyes when he ships it up to Seattle, Portland and Grants Pass.
>
> He is not helping with market penetration (we already cover that market like a blanket) he is simply whoring up the market and lowering the market price for your quality product.
>
> He is not loyal to your product line.  He is simply using it as an entré into accounts which we already service with your product.  We on the other hand have been, and continue to be loyal to CarSound/Magnaflow to a fault – BEYOND ANY REASONABLE DEGREE OF EXPECTATION.
>
> WE CAN NO LONGER TOLERATE THIS SITUATION.  IF WE NEED TO GO TO WAR ON PRICE WE WILL DO SO.  THIS WILL NOT SERVE EITHER OF US WELL.
>
> I do not like to play the "largest customer card" but I am beginning to wonder what advantage we gain by our continuing loyalty.  It is time for you to show some moral backbone and step up to the issue.  I expect you to inform Harold in writing (and give me a copy of the correspondence) that he is NOT authorized to sell your product outside of California and if he continues to do so beyond January 10 he will no longer be allowed to carry the product in California.  We will be glad to take him out of his inventory (you should do the lift and we will buy it from you) on or before January 10.  We will assure that you do not lose market penetration in California and the Northwest!

ORDER – 11

First Lundsgaard Decl., Ex. M.  A couple of weeks after Mr. Blanding sent that e-mail, he forwarded that same message to Mr. Norris again, asking "SECOND TIME: AM I GOING TO HEAR BACK FROM YOU SOON?"  First Lundsgaard Decl., Ex. N. Gorlick cites these e-mails as evidence that "justifies a reasonable inference" that Allied and Car Sound agreed that Car Sound would not ship to Gorlick in the Northwest, and "certainly indicates Car Sound's actions were not 'independent.'"  Pltf.'s Opp'n at 21.

The court again disagrees with Gorlick's characterization of the evidence.  This e-mail amounts to an attempt by Allied to convince Car Sound to grant Allied an exclusive distributorship in the Northwest.  While the e-mail does note that Car Sound had previously decided not to sell to Gorlick in the Northwest ("You assure us that he is not supposed to have the product line outside of California"), this e-mail does not establish that that decision was made at Allied's behest.  Car Sound's lack of response to this e-mail only highlights that Mr. Blanding's e-mail was a one-way communication that does not establish the existence of any agreement between Allied and Car Sound.  Car Sound employee Gennaro Paolone testified in a deposition regarding his response to Mr. Blanding's e-mail: "I said to Larry [Norris], 'Did you read that e-mail?' And he said, 'Yes.'  And I said, 'Okay.'  I just laughing about it.  I said nothing.  We didn't come up with any kind of decision.  We didn't do nothing.  We just laughing about it." Thomsen Decl. (Dkt. # 84), Ex. 1 at 44:16-20.  Allied's approval of Car Sound's decision does not transform Car Sound's decision into an agreement between Car Sound and Allied.

### 3.   Mr. Paolone's Deposition.

Car Sound's Gennaro Paolone described the genesis of Car Sound's refusal to ship to Gorlick in the Northwest:

> There was a time – what's happening, Allied open a place there in Washington or Oregon.  And for a period of time, Gorlick never bought nothing from us.  When Allied start to sell product there, and that's the time

ORDER – 12

> when Gorlick start to ask us if we want to ship to that area there.  And that's why we said, "Right now, we have" – "we have other distributor, they're selling that there and we don't" – "right now we don't want to" – anyway, we don't need another distributor in that area.  That's why we said we don't ship to them.

First Lundsgaard Decl., Ex. A at 138-39.  Gorlick's Steve Ferguson testified in a deposition that he heard Mr. Gorlick ask Mr. Paolone about Car Sound's refusal to ship to Gorlick in the Northwest, and that Mr. Paolone answered "I gave my word.  I'm going to keep my word.  I'm a man of my word," and that that answer suggested to Mr. Ferguson that Car Sound "had an agreement with [Mr. Blanding] that he wasn't going to break his word.  He was holding up his end of the agreement . . . [n]ot to ship to Gorlick's in the Northwest."  First Lundsgaard Decl., Ex. H at 202:7-15.

But Mr. Ferguson's speculation about the meaning of Mr. Paolone's statement squarely contradicts the deposition testimony of Mr. Paolone and Mr. Gorlick — the parties to the conversation.  Mr. Gorlick, when questioned about a conversation he had with Mr. Paolone about Car Sound's refusal to ship to Gorlick in the Northwest, said that he told Mr. Paolone that he had talked to Mr. Blanding and that Mr. Blanding "denies having made the agreement with [Car Sound] not to sell [to Gorlick] in the Northwest." Thomsen Decl. (Dkt. # 84), Ex. 3 at 196.  According to Mr. Gorlick's testimony, Mr. Paolone answered, "[Mr. Blanding] didn't lie to you.  He didn't make the agreement with me.  I made the agreement with him." *Id.*  Counsel then clarified with Mr. Gorlick: "So Mr. Paolone told you that Mr. Blanding didn't make an agreement with him?" and Mr. Gorlick answered, "Yeah.  So – okay, that's good enough." *Id*.  Mr. Paolone also testified as follows:

> Q     Did you at any point tell Mr. Gorlick that Car Sound had an agreement with Allied not to ship to Gorlick in the Northwest?
>
> A     We never had any agreement.

ORDER – 13

Q      I'm sorry?

A      We never had any kind of agreement with Allied.

Q      But my question, Mr. Paolone, did you ever tell Mr. Gorlick that Car
       Sound had an agreement with Allied not to ship to Gorlick in the
       Northwest?

A      I said we never had any kind of agreement with Allied.

Q      I take it from that, then, you would not have told Mr. Gorlick that
       you had such an agreement.

A      We never had that kind [of] agreement.  So how can I say something
       which doesn't exist.

. . .

Q      What I'm trying to find out was whether you recall at any point in
       time telling Mr. Gorlick.

A      Me personally?

Q      You personally.  Mr. Paolone.

A      No.  For sure not.

Thomsen Decl. (Dkt. # 84), Ex. 1.

       In light of the testimony of Mr. Gorlick and Mr. Paolone regarding their
conversations (or lack thereof), the court cannot credit Mr. Ferguson's speculation about
what he overheard regarding an Allied-Car Sound agreement.  Because none of the
evidence cited by Gorlick, when viewed in the light most favorable to Gorlick,
establishes the existence of an Allied-Car Sound agreement, Gorlick's Sherman Act
claim fails for lack of evidence of "concerted action."

       **4.      In the Alternative, Gorlick's Sherman Act Claim is Time-Barred.**

       Though the court has found, in the previous section, that Gorlick has failed to

ORDER – 14

present evidence establishing the existence of concerted action between Allied and Car Sound, the court finds, in the alternative, that Gorlick's Sherman Act claim fails as time-barred.

Sherman Act § 1 claims are subject to a four-year statute of limitations.  There are several exceptions to this rule, including cases where the plaintiff alleges a continuing violation such as the "active enforcement of an illegal contract."  *Aurora Enters., Inc. v. Nat'l Broadcasting Co., Inc.*, 688 F.2d 689, 694 (9th Cir. 1982).  For an act to be considered a continuing violation that will restart the statute of limitations, "(1) [i]t must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff."  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987).

In this case, Mr. Gorlick testified that Car Sound "made the agreement with Allied not to sell [to] us in the Northwest" "[p]rior to 2000, to the best of my knowledge."  Thomsen Decl. (Dkt. # 84), Ex. 3 at 64.  This lawsuit was not filed until 2007, but Gorlick contends that two 2004 Car Sound deliveries to Gorlick's Seattle location show that the Allied-Car Sound agreement was not permanent, but instead could have been rescinded at any time.  Therefore, under *Hennegan v. Pacifico Creative Serv. Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1979), Gorlick argues that every time Car Sound refused to ship to Gorlick in the Northwest — as recently as 2007 —  the limitations period restarted.

The court finds this case to be distinguishable from *Hennegan*, where the defendants apparently took action during the limitations period to extend the terms of a previous (pre-limitations period) agreement, and instead analogous to *Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936 (9th Cir. 1981).  In *Orgell*, a plaintiff retailer alleged that the defendant had agreed with the plaintiff's competitor that the defendant would not sell any product to the plaintiff.  The original agreement, which the court characterized as

ORDER – 15

"irrevocable, immutable, permanent and final," was reached before the limitations period, and the defendant continued to refuse to sell to the plaintiff throughout the limitations period. The court found that because during the limitations period, the defendant had merely reaffirmed an agreement reached before the limitations period, the Sherman Act claim was time-barred. *See Orgell*, 640 F.2d at 938.

The court finds that the evidence here shows that Car Sound decided before 2000 not to ship to Gorlick in the Northwest. Two 2004 order slips indicating delivery at Gorlick's Seattle location do not suggest that Car Sound's decision was not final; the one-part purchases are too insignificant to indicate anything about Car Sound's general policy. *See* Gorlick Decl. (Dkt. # 93), Ex. A. Furthermore, those "delivery notes" do not even necessarily establish that delivery actually occurred in Seattle, given that Car Sound refused to honor orders requesting Seattle delivery. *See* Heffron Decl. (Dkt. # 94), Ex. B (letter from Car Sound explaining that the orders placed for Seattle delivery will not be filled, given Car Sound's refusal to ship to Gorlick there). Gorlick's evidence about Car Sound selling to other Northwest locations during the limitations period is irrelevant to Car Sound's alleged agreement with Allied regarding Gorlick. *See* First Lundsgaard Decl. (Dkt. # 96), Ex. H at 201.

Thus, because the evidence shows that Car Sound's pre-2000 decision to not ship to Gorlick was reaffirmed throughout the limitations period, the court finds that Gorlick's Sherman Act claim is time-barred.

ORDER – 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART Defendant's motion (Dkt. # 83).

DATED this 26th day of October, 2010.

The Honorable Richard A. Jones
United States District Judge

ORDER – 17